[This decision has been published in *Ohio Official Reports* at 95 Ohio St.3d 505.]

CHARVAT, APPELLANT, *v*. DISPATCH CONSUMER SERVICES, INC. ET AL.,

APPELLEES.

[Cite as *Charvat v. Dispatch Consumer Serv., Inc.*, 2002-Ohio-2838.]

*Consumer protection—Telephone Consumer Protection Act—Existing customer can terminate an "established business relationship" by requesting to be placed on a "do not call" list.*

(No. 2000-1725—Submitted October 3, 2001—Decided June 26, 2002.)

APPEAL from the Court of Appeals for Franklin County, No. 99AP-1368.

_____

SYLLABUS OF THE COURT

An existing customer can effectively terminate an "established business relationship" for purposes of the Telephone Consumer Protection Act, Section 227, Title 47, U.S.Code, by requesting to be placed on a "do not call" list.

_____

PFEIFER, J.

{¶1} The issue in this case is whether in establishing a limited relationship with a business, consumers waive their right to the protection of the Telephone Consumer Protection Act ("TCPA"), Section 27, Title 47, U.S.Code. We find that an existing customer can effectively terminate an "established business relationship" for purposes of the TCPA by requesting to be placed on a "do not call" list.

Factual Background

{¶2} Plaintiff-appellant Philip J. Charvat filed this action against defendants-appellees Dispatch Consumer Services, Inc., and the Dispatch Printing Company, Inc. (collectively, "the Dispatch"), alleging that the Dispatch had

engaged in improper telephone solicitations in violation of the Telephone Consumer Protection Act ("TCPA"), Section 227, Title 47, U.S.Code.

**{¶3}** Charvat claims that the Dispatch made unsolicited phone calls to him asking him to purchase a weekday newspaper subscription. On August 2, 1996, Charvat requested that the Dispatch cease making telemarketing sales calls to his home. At the time, Charvat was already a Dispatch subscriber on a Sunday only basis. After Charvat's "Do Not Call" ("DNC") demand, the Dispatch made at least two additional calls in the next twelve months to Charvat's household soliciting a subscription to the Dispatch's weekday newspaper.

**{¶4}** On August 4, 1998, Charvat filed suit against the Dispatch. Charvat alleged that the Dispatch had violated the TCPA by continuing to solicit him by telephone after his DNC request. Charvat also alleged other violations of state consumer protection statutes.

**{¶5}** On September 8, 1998, the Dispatch filed a motion to dismiss and/or for summary judgment seeking dismissal of all of Charvat's claims. In its September 15, 1999 decision, the trial court granted the Dispatch's motion, finding that the Dispatch was exempted from the TCPA as to Charvat because it enjoyed an "established business relationship" with him. The Act, designed to protect consumers from unwanted telephone solicitations, excludes from the definition of "telephone solicitation" calls made to someone with whom the caller has an "established business relationship." Section 227(a)(3)(B), Title 47, U.S.Code. The trial court also found in the Dispatch's favor on Charvat's state law claims.

**{¶6}** Charvat appealed only the portion of the decision concerning his TCPA claim. The court of appeals affirmed the judgment of the trial court.

**{¶7}** The cause is before this court upon the allowance of a discretionary appeal.

Law and Analysis

**{¶8}** Telemarketing has become a garish billboard planted firmly in the center of the cultural landscape, and has become the target of professional and water-cooler social commentators throughout the nation:

**{¶9}** " 'SEINFELD: (PHONE RINGING) Hello.

**{¶10}** " '(TELEMARKETER): Hi. Would you be interested in switching over to TMI long-distance service?

**{¶11}** " 'SEINFELD: Oh, gee, I can't talk right now. Why don't you give me your home number and I'll call you later?

**{¶12}** " '* * *

**{¶13}** " '(TELEMARKETER): Well, I'm sorry. We're not allowed to do that.

**{¶14}** " 'SEINFELD: I guess you don't want people calling you at home.

**{¶15}** " '(TELEMARKETER): No.

**{¶16}** " 'SEINFELD: Well, now you know how I feel.' " Shannon, Combating Unsolicited Sales Calls: The "Do-Not-Call" Approach to Solving the Telemarketing Problem (2001), 27 J. Legis. 381, fn. 1.

**{¶17}** We are not called upon to judge the telemarketing industry. We are not asked to balance its obvious failings against the employment it creates and the economic efficiencies it can engender. Instead, we are called upon simply to apply a statute, and in turn to determine what level of deference this court owes to the governmental agency that has created regulations based upon the statute.

**{¶18}** In response to the burgeoning use of telephone solicitations to market goods and services in the United States, and the concomitant frustration of the American public, Congress passed the TCPA in 1991. P.L. No. 102-243, 105 Stat. 2394. At that time, Congress found that 18 million Americans each day received a telephone solicitation. Not surprisingly, Congress also determined that "[m]any consumers are outraged over the proliferation of intrusive, nuisance calls to their

homes from telemarketers." 137 Cong.Rec. 518781-02; 137 Cong.Rec. H11307-01. The federal government stepped in to address the problem because individual states were unable to regulate telemarketers' interstate operations. P.L. No. 102-243 Section 2, 105 Stat. 2394.

{¶19} The TCPA was the result of Congress's effort to balance individual privacy with freedom of speech and trade. The teeth of the Act, which allows consumers to sue overzealous telemarketers, is at issue in this case. Section 227(c)(5), Title 47, U.S.Code provides a private right of action to "[a] person who has received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the regulations prescribed under this subsection." The regulations prescribed under the statute include Section 64.1200(e)(vi), Title 47 C.F.R, which forbids telemarketers from soliciting by telephone anyone who has previously requested to be put on a DNC list. In this case, Charvat alleges that the Dispatch made telephone solicitations at least twice after his DNC request.

{¶20} Congress created an exception to the purview of the Act as a part of its balancing of commerce and privacy. Section 227(a)(3)(B), Title 47, U.S.Code excludes from the definition of "telephone solicitation" a call made "to any person with whom the caller has an established business relationship." Thus, a consumer has no right of action under Section 227(c)(5) against a caller with whom he has an "established business relationship" ("EBR"). The trial and appellate courts in this case found that an EBR existed between Charvat and the Dispatch because Charvat subscribed to the Sunday Dispatch at the time of the telephone calls at issue.

{¶21} The TCPA itself does not define what constitutes an EBR. That question is central to this case, as well as the issue of how an EBR can be terminated. The Federal Communications Commission ("FCC") has undertaken to resolve both of those issues pursuant to its rulemaking authority delegated by Congress. But is this court bound by how the FCC has resolved these issues?

**{¶22}** The United States Supreme Court instructs us that courts do owe deference to an agency's rulemaking authority. In *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.* (1984), 467 U.S. 837, 843-844, 104 S.Ct. 2778, 81 L.Ed.2d 694, the court held:

**{¶23}** " 'The power of an administrative agency to administer a congressionally created * * * program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress.' *Morton v. Ruiz*, 415 U.S. 199, 231 [94 S.Ct. 1055, 39 L.Ed.2d 270] (1974). If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation. Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute. Sometimes the legislative delegation to an agency on a particular question is implicit rather than explicit. In such a case, a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency." (Footnote omitted; ellipses *sic*.)

**{¶24}** Here, the TCPA is the skeleton of a system designed to rein in the proliferation of telemarketing calls. Much of the detail was left to the FCC. Congress's delegation was both explicit and implicit. In Section 227(c), Congress explicitly set forth the FCC's role in implementing the overarching aim of the Act:

**{¶25}** "[T]he Commission shall initiate a rulemaking proceeding concerning the need to protect residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object."

**{¶26}** This explicit delegation of the FCC's role creates implicit powers where Congress fails to fill in the blanks. Congress did not define "established business relationship" within the TCPA, either in its definitional section, Section U.S.C. 227(a), or elsewhere. The FCC stepped into that breach and defined what constitutes an EBR in Section 64.1200(f)(4), Title 47, C.F.R.:

**{¶27}** "The term 'established business relationship' means a prior or existing relationship formed by a voluntary two-way communication between a person or entity and a residential subscriber with or without an exchange of consideration, on the basis of an inquiry, application, purchase or transaction by the residential subscriber regarding products or services offered by such person or entity, which relationship has not been previously terminated by either party."

**{¶28}** *Chevron* requires this court to defer to the agency regulation as to the definition of an EBR. Certainly, the FCC's definition is a reasonable one given the Act's purpose of regulating telemarketing. The definition is not an exhaustive one for use in all contexts, but it reflects Congress's purpose. It allows businesses to contact individuals who have previously invited or acquiesced to calls without violating the TCPA.

**{¶29}** While establishing that the EBR exemption exists only if the "relationship has not been previously terminated by either party," the FCC does not explain within its regulations what it takes to terminate a relationship. However, in interpreting its own rules, the FCC did undertake to set forth how an EBR can be severed.

**{¶30}** The regulation defining an "established business relationship" first appeared in the FCC's Report and Order (1992), 7 F.C.C.R. 8752, 1992 WL 690928, Appendix B. In its Report and Order, the FCC discussed public comments it had received on the proposed rule and its own interpretation of the rule as adopted. As a part of that discussion and interpretation, the FCC directly addressed the issue present in this case.

**{¶31}** "We emphasize, however, that a business may not make telephone solicitations to an existing or former customer who has asked to be placed on that company's do-not-call list. A customer's request to be placed on the company's do-not-call list *terminates the business relationship between the company and that*

*customer for the purpose of any future solicitation*." (Emphasis added.) Id. at fn. 63.

**{¶32}** The FCC makes clear that an existing customer who requests to be put on a do-not-call list retains the same rights as a noncustomer who makes a similar demand:

**{¶33}** "The definition of 'telephone solicitation' in §227(a)(3) also excludes calls made to parties with whom the caller has an established business relationship and calls for which the calling party has received the called party's prior express invitation or permission.  We emphasize, however, that subscribers may sever any business relationship, i.e., revoke consent to any future solicitations, by requesting that they not receive further calls from a telemarketer, thus subjecting that telemarketer to the requirements of § 64.1200(e)." Id. at fn. 47.

**{¶34}** Thus, the FCC, the agency entrusted with the development of rules for the interpretation of the TCPA, has set forth its opinion that a consumer can sever its EBR with a business such that the telemarketer loses its exemption from the TCPA.  The FCC firmly answers that current customers can gain the protection of the TCPA by requesting to be put on a DNC list.

**{¶35}** But are an agency's interpretations of its own regulations also subject to deference by courts?  In *Stinson v. United States* (1993), 508 U.S. 36, 44-45, 113 S.Ct. 1913, 123 L.Ed.2d 598, the court held that an agency's commentary regarding its own rules is due even greater deference than the court gives rules in *Chevron*:

**{¶36}** "Commentary * * * has a function different from an agency's legislative rule.  Commentary, unlike a legislative rule, is not the product of delegated authority for rulemaking, which of course must yield to the clear meaning of a statute. * * * Rather, commentary explains the guidelines and provides concrete guidance as to how even unambiguous guidelines are to be applied in practice.

**{¶37}** "The functional purpose of commentary * * * is to assist in the interpretation and application of those rules, which are within the [Sentencing]

Commission's particular area of concern and expertise and which the Commission itself has the first responsibility to formulate and announce. * * * As we have often stated, provided an agency's interpretation of its own regulations does not violate the Constitution or a federal statute, it must be given 'controlling weight unless it is plainly erroneous or inconsistent with the regulation.' "

{¶38} Pursuant to *Stinson*, we must follow the FCC's commentary unless it is at odds with the regulation it explains. We find the agency's interpretation to be perfectly in line with the regulation. Section 64.1200(f)(4), Title 47, C.F.R. defines an EBR, but also states that the privileges associated with an EBR exist only until the relationship terminates. The agency commentary explains how that relationship ends.

{¶39} The FCC opines that a person can sever an established business relationship simply by asking to be put on a DNC list. The DNC does not destroy every aspect of a relationship; instead, it "terminates the business relationship * * * for the purpose of any future solicitation." 7 F.C.C.R. 8752, fn. 63, 1992 WL 690928. The FCC does not require that the subscriber stop purchasing from a company associated with the telemarketer. It requires only that the consumer seek to cease the "voluntary two-way communication" that is the definitional heart of the "established business relationship." Section 64.1200(f)(4), Title 47, C.F.R. That is enough to overcome the assumed acquiescence to receiving telemarketing calls.

{¶40} Appellees argue that giving established customers the benefit of the Act after a DNC request list renders the EBR exception a nullity. They argue that there is no distinction then between how telemarketers must treat established customers and other people receiving telephone calls. It is true that *after* a DNC request an established customer and a noncustomer enjoy the same protections under the TCPA. However, as the FCC report points out, it is not until a person

who has an EBR with a telemarketer requests to be placed on a DNC list that a company must comply with the dictates of Section 64.1200.

{¶41} Without an EBR, telemarketers may not call before 8:00 a.m. or after 9:00 p.m. [Section 64.1200(e)(1), Title 47, C.F.R.], must provide the name and the address or phone number of the caller [Section 64.1200(e)(2)(iv)], may not make an unrequested prerecorded solicitation call [Section 64.1200(a)(2)], and may not send an unsolicited advertisement to a telephone facsimile machine [Section 64.1200(a)(3)].

{¶42} By contrast, an entity making calls only to persons with whom it already has an EBR does not have to comply with the DNC list requirements of Section 64.1200(e)(2). A company that called only existing customers would not have to have a written policy for maintaining a DNC list [64.1200(e)(2)(i)], would not be required to train personnel regarding those lists [64.1200(e)(2)(ii)], and would not have to maintain a DNC list [64.1200(e)(2)(vi)].

{¶43} Thus, an EBR does provide a business with tangible benefits that it can enjoy prior to an existing customer's DNC request. Only after an existing customer ends the EBR do the requirements and restrictions of Section 64.1200, Title 47, C.F.R. come into play as to that customer.

{¶44} The regulation and the commentary are both consistent with the statute at issue. The purpose of the Act is to reduce the nuisance aspect of telemarketing. Maintaining some limited commercial tie to a business should not leave consumers at the mercy of unbridled telemarketing efforts. An EBR gives a business the benefit of the doubt, not an unlimited license to call. It is not consistent with the Act that a person who subscribes to the daily newspaper in a one-newspaper town must be prisoner to telephone pitches for a publisher's panoply of products.

{¶45} We defer to and agree with the positions of the FCC on these matters. We accept its definition of an EBR as a relationship formed by a voluntary two-

way communication. We agree that when that relationship becomes involuntary and one-sided, the consumer can put an end to telephone solicitation calls. Accordingly, we reverse the judgment of the court of appeals and remand the case to the trial court.

Judgment reversed

and cause remanded.

M<small>OYER</small>, C.J., R<small>ESNICK</small>, F.E. S<small>WEENEY</small>, C<small>OOK</small> and L<small>UNDBERG</small> S<small>TRATTON</small>, JJ., concur.

D<small>OUGLAS</small>, J., dissents.

————————————

Philip J. Charvat, pro se.

Zeiger & Carpenter, John W. Zeiger and Marion H. Little, for appellees.

Robert Biggerstaff, pro se, urging reversal as amicus curiae.

————————————