The STATE of Ohio,

v.

PEPRAH.

2006-Ohio-4222.]

Franklin County Municipal Court.

Nos. 2005 TRC 127974 and 2005 TRC 139818.

Decided May 11, 2006.

---

Natalia Harris, Robert S. Tobias, and Tyler Wilcox, Assistant City Prosecutors, for plaintiff.

Marc Fagin, for defendant.

JULIA L. DORRIAN, Judge.

### Procedural History, Stipulations, and Framing of the Issues

{¶ 1} On May 17, 2005, the defendant filed a motion to suppress/in limine ("motion"). Several continuances were granted at the request of the parties. On November 9, 2005, a hearing was held on the motion. The state of Ohio was represented by Prosecutor Natalia Harris, and the defendant was represented by attorney Mark Fagin. Sworn testimony was taken, and a court reporter was present. The motion was denied.

{¶ 2} On March 27, 2005, the defendant was arrested for operating a vehicle under the influence of alcohol, pursuant to R.C. 4511.19(A)(1).[1] This impairment charge, in addition to accompanying charges of failure to yield to a public safety vehicle, a marked-lanes violation, and speeding, were filed in case No. 2005 TRC 127974. At the hearing, the defendant waived his motion to suppress issues relating to the initial stop, the field sobriety tests, probable cause, and the Miranda warnings. The defendant indicated that he would not challenge the impairment violation by way of a pretrial motion, but, rather, he would challenge it at trial.

{¶ 3} In an accompanying case, case No. 2005 TRC 139818, the defendant was charged with operating a vehicle under the influence of alcohol, pursuant to R.C. 4511.19(A)(5),[2] based on the results of the urine test that the defendant took on March 27, 2005. The result of the urine test was .196, which is considered a per se low test violation for urine.

{¶ 4} In his motion to suppress/in limine, the defendant challenged whether the urine was (1) collected on a timely basis, (2) placed in an appropriate container, (3) accurately labeled, (4) accurately stored, (5) collected and tested with no break in the chain of custody, (6) tested with a machine approved, maintained, and calibrated in accordance with the Ohio Department of Health ("ODH") regulations, (7) tested pursuant to a method approved by the ODH, and (8) tested by qualified personnel. The defendant summarized by stating that the results of the urine test are unreliable. At the hearing, however, the defendant and Prosecutor Harris stipulated to the following:

 (1) Current ODH regulations do not require a second void urine sample to be taken and tested to determine violations of R.C. 4511.19(A)(5);

---

1. Am.Sub.H.B. No. 163, 150 Ohio Laws 163 (effective Sept. 23, 2004), redesignated the former R.C. 4511.19(A)(1) as R.C. 4511.19(A)(1)(a).

2. Am.Sub.S.B. No. 123, 150 Ohio Laws 123 (effective Jan. 1, 2004), redesignated former R.C. 4511.19(A)(4) as R.C. 4511.19(A)(5); Am.Sub.H.B. No. 163, 150 Ohio Laws 163 (effective Sept. 23, 2004), redesignated former R.C. 4511.19(A)(5) as R.C. 4511.19(A)(1)(e).

(2) In the instant case a second void urine sample was not taken or tested;

(3) In the instant case only a first void urine sample was taken and tested;

(4) Applicable ODH regulations regarding the collection, handling and analysis of the first void urine sample were substantially complied with by the Bexley Police Department;

(5) There exists no documented evidence of what happened to the first void urine sample between 10:03 a.m. and 10:50 a.m. on March 28, 2005, the date of testing, however the defendant waives any challenge regarding chain of custody and its effect on substantial compliance with ODH regulations;

(6) The arresting officer, Officer Shwver, did not smell an odor of alcoholic beverage about the defendant until the defendant was outside his vehicle, and Officer Shwver described the odor as being "slight";

(7) The Bexley Police Department had a properly working breathalyzer machine at the time defendant gave a first void urine sample.

{¶ 5} At the hearing, after making the foregoing stipulations, the defendant summarized his issues as follows: (1) the results of the test were unreliable pursuant to the *Daubert*[3] standard of reliability and (2) ODH abused its discretion in promulgating rules for urine testing by not requiring a second void before testing. Prosecutor Harris objected to the defendant's framing of the issues in such a manner, because the defendant did not articulate them in this manner in his motion. The defendant argued that the prosecutor was well aware of the issue relating to second void and that she was in no way prejudiced by the lack of notice because she had prepared and brought in Mr. Kucmanic as an expert witness. The prosecutor also argued that the issues were not relevant. The court, after having considered *State v. Vega*,[4] *State v. Gordon*,[5] *State v. Cox*,[6] and *State v. Woerner*,[7] ruled that it was not appropriate to hear the defendant's *Daubert* reliability argument. Rather, the court would hear only the defendant's abuse-of-discretion argument at that time.

{¶ 6} The court will now address the defendant's abuse-of-discretion argument.

---

3. *Daubert v. Merrell Dow Pharmaceuticals, Inc.* (1993), 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469.

4. *State v. Vega* (1984), 12 Ohio St.3d 185, 12 OBR 251, 465 N.E.2d 1303.

5. *State v. Gordon*, 8th Dist., 155 Ohio App.3d 357, 2003-Ohio-6160, 801 N.E.2d 493.

6. *State v. Cox* (Apr. 18, 1985), 10th Dist. App. Nos. 84AP–671 and 84AP–672, 1985 WL 10246.

7. *State v. Woerner* (1984), 16 Ohio App.3d 59, 16 OBR 63, 474 N.E.2d 354.

## Defendant's Abuse-of-Discretion Argument

{¶ 7} The defendant argues that ODH has abused its discretion in promulgating regulations regarding urine testing because the regulations do not require that a second-void urine sample be taken and tested. Central to and implicit in the defendant's argument is his belief that (1) blood-alcohol content is the most reliable indicator of a person's impairment due to alcohol consumption and (2) by including subdivision (A)(1)(e) in R.C. 4511.19, the General Assembly intended to correlate subdivision (A)(1)(e) regarding urine per se level to subdivision (A)(1)(b) regarding whole blood per se level.

{¶ 8} Although this court determined that a *Daubert* reliability argument was not appropriate at the hearing, the defendant's reliability argument dominated his expert's testimony as well as his hearing brief and his reply brief. However, the defendant did very little to address or support his belief that the General Assembly intended to correlate subdivision (A)(1)(e) regarding urine per se level to subdivision (A)(1)(b) regarding whole blood per se level. In fact, although requested to do so by this court, the defendant did not address the intent of the General Assembly in his hearing brief. In his reply brief the defendant stated, "The Court did not explain how the legislative history would be relevant to the issue presented. Since an interpretation of R.C. 4511.19 is not in controversy, the contribution to the arguments present by the legislative history is not entirely clear. It is obvious that the legislative history has no bearing on the factual question of whether a first void of urine, as compared to a second void is reliable." The defendant has never provided this court with a review of the legislative history of R.C. 4511.19, as he was requested to do. Instead, the defendant relies on his expert's assertion that it is "obvious" that the General Assembly intended to correlate urine-alcohol level to blood-alcohol level because the statute uses a consistent correlation of approximately 1.4 to 1.0 between urine-alcohol levels and blood-alcohol levels. When questioned by this court at the hearing, the defendant's expert witness, Dr. Staubus, testified that he was not present at the legislative hearings regarding promulgation of R.C. 4511.19 or 3701.143 but that "somebody must have told them" the correlation. Dr. Staubus also testified that he is making an assumption based on the correlation, because otherwise it is a "strange coincidence."

{¶ 9} Contrary to the defendant's belief, interpretation of R.C. 4511.19 is in controversy here because the defendant's entire abuse-of-discretion argument, as well as his reliability argument, is based on one interpretation, whereas the prosecutor's counterarguments are based on another. This court will not give short shrift to the intent of the General Assembly, as the defendant has done. It is important that the court understand the General Assembly's intention before addressing the defendant's arguments that ODH abused its discretion by not

requiring a second void and that the test of the first-void urine sample is unreliable. The question is "Did the General Assembly include subdivision (A)(1)(e) in R.C. 4511.19 in an effort to correlate it to subdivision (A)(1)(b)—the per se blood offense—or did the General Assembly include subdivision (A)(1)(e) in an effort to create a separate and distinct per se urine offense, unrelated to the per se blood offense in subdivision (A)(1)(b)?"

### Review of Statutory Text for Legislative Intent

{¶ 10} The foremost consideration in determining the meaning of a statute is legislative intent.[8] " 'To determine the legislative intent, we first review the statutory language[,] * * * [according] the words used their usual, normal, or customary meaning.' "[9] When plain and unambiguous statutory language conveys a clear and definite meaning, there is no need for courts to apply rules of statutory interpretation; the court must give effect to the words used.[10] " 'In reviewing a statute, a court cannot pick out one sentence and disassociate it from the context, but must look to the four corners of the enactment to determine the intent of the enacting body.' "[11]

{¶ 11} The court will now look at the words of the statute and the four corners only to determine if the language is plain and unambiguous and conveys a clear and definite meaning.

{¶ 12} R.C. 4511.19(A) reads:

(A)(1) No person shall operate any vehicle, streetcar, or trackless trolley within this state, if, at the time of the operation, any of the following apply:

(a) The person is under the influence of alcohol, a drug of abuse, or a combination of them.

(b) The person has a concentration of eight-hundredths of one per cent or more but less than seventeen-hundredths of one per cent by weight per unit volume of alcohol in the person's whole blood.

---

8. *State v. Reedy*, 10th Dist. No. 05AP–501, 2006-Ohio-1212, 2006 WL 648861, citing *State v. Jackson*, 102 Ohio St.3d 380, 2004-Ohio-3206, 811 N.E.2d 68.

9. *Reedy*, 2006-Ohio-1212, 2006 WL 648861, ¶ 12, quoting *State ex rel. Wolfe v. Delaware Cty. Bd. of Elections* (2000), 88 Ohio St.3d 182, 184, 724 N.E.2d 771.

10. *Reedy*, 2006-Ohio-1212, 2006 WL 648861, citing *State ex rel. Jones v. Conrad* (2001), 92 Ohio St.3d 389, 750 N.E.2d 583; *State v. Elam* (1994), 68 Ohio St.3d 585, 629 N.E.2d 442.

11. *Jackson*, 102 Ohio St.3d 380, 2004-Ohio-3206, 811 N.E.2d 68, quoting *State v. Wilson* (1997), 77 Ohio St.3d 334, 336, 673 N.E.2d 1347; *MacDonald v. Bernard* (1982), 1 Ohio St.3d 85, 89, 1 OBR 122, 438 N.E.2d 410.

(c) The person has a concentration of ninety-six thousandths of one per cent or more but less than two hundred four-thousandths of one per cent by weight per unit volume of alcohol in the person's blood serum or plasma.

(d) The person has a concentration of eight-hundredths of one gram or more but less than seventeen-hundredths of one gram by weight of alcohol per two hundred ten liters of the person's breath.

(e) The person has a concentration of eleven-hundredths of one gram or more but less than two hundred thirty-eight-thousandths of one gram by weight of alcohol per one hundred milliliters of the person's urine.

(f) The person has a concentration of seventeen-hundredths of one per cent or more by weight per unit volume of alcohol in the person's whole blood.

(g) The person has a concentration of two hundred four-thousandths of one per cent or more by weight per unit volume of alcohol in the person's blood serum or plasma.

(h) The person has a concentration of seventeen-hundredths of one gram or more by weight of alcohol per two hundred ten liters of the person's breath.

(i) The person has a concentration of two hundred thirty-eight-thousandths of one gram or more by weight of alcohol per one hundred milliliters of the person's urine.

{¶ 13} R.C. 4511.19(D) reads:

(D)(1) In any criminal prosecution or juvenile court proceeding for a violation of division (A) or (B) of this section or for an equivalent offense, the court may admit evidence on the concentration of alcohol, drugs of abuse, or a combination of them in the defendant's whole blood, blood serum or plasma, breath, urine, or other bodily substance at the time of the alleged violation as shown by chemical analysis of the substance withdrawn within two hours of the time of the alleged violation.

\* \* \*

The bodily substance withdrawn shall be analyzed in accordance with methods approved by the director of health by an individual possessing a valid permit issued by the director pursuant to section 3701.143 of the Revised Code.

{¶ 14} Finally, R.C. 3701.143 reads:

For purposes of Section 4511.19 of the Revised Code, the director of health shall determine, or cause to be determined, techniques or methods for chemically analyzing a person's blood, urine, breath, or other bodily substance in order to ascertain the amount of alcohol, a drug of abuse, or alcohol and a drug of abuse in the person's blood, urine, breath, or other bodily substance. The director shall approve satisfactory techniques or methods, ascertain the qualifications of individuals to conduct such analyses. Such permits shall be subject to termination or revocation at the discretion of the director.

{¶ 15} The court has carefully reviewed the four corners of R.C. 4511.19 and considered whether the language is clear and definite. The use of the word "any" in division (A)(1), as well as the use of the word "or" in division (D)(1), leads this court, at first blush, to believe that the legislature intended to create separate and distinct per se offenses for urine and blood, which are unrelated to each other. Nevertheless, this court acknowledges that courts have ruled differently when presented with similar challenges to urine per se offenses. The defendant has called to this court's attention my honorable colleague Judge Taylor's decision in *State v. Gaye,*[12] as well as the decision of Judge Boyer in *State v. Oliver.*[13] This court has carefully reviewed these decisions and notes that both decisions, favorable to the defendant, are premised on an understanding of the law that correlates urine-alcohol content to blood-alcohol content for purposes of determining impairment due to alcohol.[14] The aforementioned decisions, and the premise or assumption upon which they were based, lead this court to believe that R.C. 4511.19 is ambiguous and subject to more than one reasonable interpretation. The existence in the statutory text of the consistent correlation of 1.4 to 1.0 between urine-alcohol levels and blood-alcohol levels also supports more than one reasonable interpretation. Therefore, the court must now determine the legislature's intent by looking at factors other than the four corners and words of the statute.

### Review of Legislative History and Former Statutory Provisions for Legislative Intent

 {¶ 16} When statutory language is subject to more than one reasonable interpretation, it is ambiguous and the court must give effect to the legislature's

---

12. *State v. Gaye* (Nov. 2, 2000), Franklin M.C. Nos. 2000 TRC 143892 and 2000 TRC 162041, Motion Hearing Entry.

13. *State v. Oliver* (Sept. 25, 2000), Washington C.P. No. 00CR15, Ruling on Motion to Suppress.

14. Judge Boyer states, "Alcohol concentration in the blood is an accepted and scientifically reliable indicator of the degree of intoxication of a person. It is this relationship that has given rise to the testing of bodily substances in order to determine that concentration in OMVI prosecutions * * *. There is no scientific relation between the amount of alcohol in the blood, which determines the degree of intoxication of a person, and the amount of alcohol in urine after more than an hour has passed since the last void." Judge Taylor states, "Defendant's Motion to Suppress the Results of Defendant's Urine Test used to determine Defendant's blood alcohol content (BAC) came on for hearing. * * * The Court agrees that a more reliable evaluation of Defendant's BAC could be obtained through the utilization of a second void urine sample. * * * Indeed, accurate BAC results must be established when the offense consists of essentially three elements: 1) operating a motor vehicle; 2) within this state; 3) with a concentration of two hundred thirty-eight-thousandths of one gram or more by weight of alcohol per one hundred milliliters of the person's urine."

intent when construing such language.[15] A court may look to a host of factors, including the purpose of the statute, to determine legislative intent.[16]

{¶ 17} R.C. 1.49 states that if a statute is ambiguous, the court, in determining legislative intent, may consider among other matters:

(C) The legislative history;

(D) The common law or former statutory provisions, including laws upon the same or similar subjects * * *.

{¶ 18} The court will now examine the legislative history and former statutory provisions of R.C. 4511.19(A)(1) and 3701.143 in search of legislative intent.

{¶ 19} A prohibition against operating a vehicle while under the influence of "intoxicating liquor" was first enacted in 1941 by the General Assembly with the enactment of General Code 6307–19.[17] In 1953, with the Bureau of Code Revision, General Code 6307–19 was converted to R.C. 4511.19.[18] In 1963, the General Assembly amended the statute to refer to "alcohol" rather than "intoxicating liquor." [19]

{¶ 20} In 1968, the General Assembly added the following language to R.C. 4511.19:

In any criminal prosecution for a violation of this section, or ordinance of any municipality relating to driving a vehicle while under the influence of alcohol, the court may admit evidence on the *concentration of alcohol in the defendant's blood* at the time of the alleged violation as shown by chemical analysis of the defendant's blood, urine, breath, or other bodily substance withdrawn within 2 hours of the time of such alleged violation * * * Such bodily substance shall be analyzed in accordance with methods approved by the director of health by an individual possessing a valid permit issued by the director of health pursuant to section 3701.143 of the Revised Code. Such evidence gives rise to the following;

(A) If there was at the time a concentration of less than fifteen hundredths of one percent by weight of alcohol in the defendant's blood, such fact shall not give rise to any presumption that the defendant was or was not under the

---

15. *Reedy*, 2006-Ohio-1212, 2006 WL 648861, citing *Family Medicine Found., Inc. v. Bright*, 96 Ohio St.3d 183, 2002-Ohio-4034, 772 N.E.2d 1177.

16. *Reedy*, 2006-Ohio-1212, 2006 WL 648861, citing *Jackson*, 102 Ohio St.3d 380, 2004-Ohio-3206, 811 N.E.2d 68.

17. Am.Sub.S.B. No. 49, 119 Ohio Laws 766 (effective Sept. 6, 1941).

18. Bureau of Code Revision (effective Oct. 1, 1953).

19. S.B. No. 41, 130 Ohio Laws 1083 (effective July 11, 1963).

influence of alcohol but such fact may be considered with other competent evidence in determining the guilt or innocence of the defendant.

(B) If there was at that time a concentration of fifteen hundredths of one percent or more by weight of alcohol in the defendant's blood it shall be presumed that the defendant was under the influence of alcohol.[20]

The same Amended Substitute House Bill 380 added R.C. 3701.143, which stated:

The director of health shall determine, or cause to be determined, techniques or methods for chemically analyzing a person's blood, urine, breath, or other bodily substance in order to ascertain the amount of alcohol in a person's *blood.* The director shall approve satisfactory techniques or methods, ascertain the qualifications of individuals to conduct such analyses, and issue permits to qualified persons authorizing them to perform such analyses. Such permits shall be subject to termination or revocation at the discretion of the director.[21]

The Legislative Service Commission Bill Analysis for Amended Substitute House Bill 380 states that "[t]he director health is charged with the responsibility of determining technical methods for chemically analyzing a person's bodily substances *in order to determine blood alcohol content* * * * The bill authorizes courts to admit evidence on concentration of alcohol in a person's system if taken within two hours of the violation * * *." [22]

{¶ 21} From a review of these former statutory provisions and the legislative history of R.C. 4511.19 and 3701.143, it appears that the original intent of the General Assembly was indeed to correlate urine sample analysis to the amount of alcohol in the blood, rather than to create a separate and unrelated per se urine offense. Until making a final determination, however, it is necessary to review subsequent amendments to R.C. 4511.19 and 3701.143 and consider how the original versions evolved into the versions in effect today.

{¶ 22} In 1971, the General Assembly, with Amended Senate Bill 14, amended R.C. 4511.19 by changing "fifteen hundredths" to "ten hundredths" of one percent by weight of alcohol in the defendant's blood as the level at which either (1) such evidence could be considered when determining guilt or innocence of a defendant or (2) such evidence created a presumption that the defendant was under the influence of alcohol. Amended Senate Bill 14 also included division (C), which created a presumption that the defendant was not under the influence of alcohol

---

20. (Emphasis added.) Am.Sub.H.B. No. 380, 132 Ohio Laws 380 (effective Jan. 1, 1968).

21. (Emphasis added.) Id.

22. (Emphasis added.) Legislative Service Commission Analysis of House Bill 380, As Reported by the Senate Committee on Urban and Highway Affairs, considered by the 107th General Assembly, available at Supreme Court of Ohio Law Library on microfiche.

if the blood-alcohol content was less than five hundredths of one percent by weight of alcohol.[23] The General Assembly kept in place the language permitting admission of "evidence on the concentration of alcohol in the defendant's blood at the time of the alleged violation as shown by chemical analysis of the defendant's blood, breath, urine, or other bodily substance."[24]

{¶ 23} In 1983, the General Assembly enacted Amended Substitute Senate Bill 432 and amended R.C. 4511.19(A) to include separate per se levels for blood-, breath-, and urine-alcohol content, at or above which a defendant would be found guilty of operating a vehicle under the influence of alcohol. Subdivision (A)(2) prohibited the operation of a motor vehicle with .10 percent blood-alcohol content, subdivision (A)(3) prohibited the operation of a motor vehicle with .10 grams of alcohol per 210 liters of breath, and subdivision (A)(4) prohibited the operation of a motor vehicle with .14 grams of alcohol per 100 milliliters of urine. Division (B) amended the existing language previously found in division (A) to read:

(B) In any criminal prosecution for a violation of this section or of an ordinance of any municipal corporation relating to OPERATING ~~driving~~ a MOTOR vehicle while under the influence of alcohol, the court may admit evidence on the concentration of alcohol in the defendant's blood, BREATH, OR URINE at the time of alleged violation as shown by chemical analysis of the defendant's blood, urine, breath, or other bodily substance withdrawn within two hours of the time of such alleged violation.[25]

This legislation reflects the point at which R.C. 4511.19 was amended to delete the clear original intent of the General Assembly to permit urine analysis in order to ascertain the concentration of alcohol in the blood. Now the intent is not so clear from the text of the statute. The Legislative Service Commission analyses provide some clues as to whether the legislature intended to preserve its original intent, as the defendant suggests, or whether the legislature intended something different from what it had originally intended, as the prosecutor suggests.

{¶ 24} The versions of Senate Bill 432 that were passed by the Senate Judiciary Subcommittee, the full Senate Judiciary Committee, the full Senate, the House Judiciary Committee, and the full House each contain a reference to breath-alcohol and urine-alcohol concentrations "comparable" to blood-alcohol concentrations.[26] The Legislative Service Commission analysis of the version of Senate Bill 432 as passed by the Senate reads:

---

23. Am.S.B. No. 14, 134 Ohio Laws 14 (effective Dec. 3, 1971).

24. Am.S.B. No. 14.

25. Am.Sub.S.B. No. 432, 139 Ohio Laws 432 (effective Mar. 16, 1983).

26. Legislative Service Commission Analyses of Senate Bill 432 (As Reported by Senate Judiciary Subcommittee, As Reported by the Senate Judiciary Committee, As Passed by the

The bill would replace the three rebuttable presumptions in current law with the three new prohibitions described above that prohibit persons from operating a motor vehicle with a certain amount of alcohol in their blood, breath or urine.

In short, the bill would prohibit a person with a .10% or more blood-alcohol concentration *(or a comparable breath-alcohol or urine-alcohol concentration)* from driving based upon the apparent assumption that a person with that amount of alcohol in his blood, breath or urine is intoxicated.[27]

The Legislative Services Commission analysis of the version of Senate Bill 432 as passed by the House states:

The bill would specify that a chemical test showing less than .10% blood-alcohol, less than .10 grams of alcohol per 210 liters of breath, or less than .14 grams of alcohol per 100 milliliters of urine could be considered with other competent evidence in determining the guilt or innocence of the defendant, however it would eliminate the presumption that if a defendant's blood alcohol level is .05% or less, the defendant is presumed innocent of operating a motor vehicle under the influence. The bill would also eliminate the presumption that a defendant is presumed guilty of operating a motor vehicle under the influence if his blood alcohol level is .10% or more, but would expand the presumption to include a *comparable* breath-alcohol or urine-alcohol concentration and make the expanded presumption applicable to homicide by vehicle cases in which the trier of fact determines whether the person guilty of homicide by vehicle was under the influence of alcohol when he committed the offense.[28]

{¶ 25} In 1993, the General Assembly amended R.C. 3701.143 to. reflect the amendments previously made to R.C. 4511.19(A). R.C. 3701.143 was amended to read:

For purposes of Section 4511.19 of the Revised Code, the director of health shall determine * * * in order to ascertain the amount of alcohol, a drug of abuse, or alcohol and a drug of abuse in the person's blood, urine, breath or other bodily substance.[29]

---

Senate, As Reported by the House Judiciary, As Passed by the House versions, considered by the 114th General Assembly), available at Supreme Court of Ohio Law Library on microfiche.

27. (Emphasis added.) Legislative Service Commission Analyses of Senate Bill 432 (As Passed by the Senate, considered by the 114th General Assembly), available at Supreme Court of Ohio Law Library on microfiche.

28. (Emphasis added.) Legislative Service Commission Analyses of Senate Bill 432 (As Passed by the House, considered by the 114th General Assembly), available at Supreme Court of Ohio Law Library on microfiche.

29. Am.H.B. 657, 144 Ohio Laws 657 (effective Apr. 16, 1993).

{¶ 26} The language in R.C. 3701.143 reflects the version in effect today.

{¶ 27} In 2000, the General Assembly amended R.C. 4511.19(A) to include separate per se levels for blood-, breath-, and urine-alcohol content, at or above which a defendant would be found guilty of operating a vehicle under the influence of alcohol with a "high" concentration of alcohol, whereas concentrations below these new per se levels, but at or above the existing per se levels, would be considered a "low" concentration of alcohol per se offense. High concentration was found in subdivision (A)(5) at seventeen hundredths blood, in subdivision (A)(6) at seventeen hundredths breath, and in subdivision (A)(7) at two hundred thirty-eight thousandths of one gram by weight of alcohol per one hundred milliliters of the defendant's urine.[30]

{¶ 28} In 2003, the General Assembly amended the per se "low" concentration levels from ten hundredths to eight hundredths for blood, ten hundredths to eight hundredths for breath, and fourteen hundredths to eleven hundredths for urine.[31] The General Assembly also added "low" and "high" test per se levels for blood serum or plasma.[32]

{¶ 29} Although the original intent of the General Assembly was very clear, subsequent amendments to R.C. 4511.19 and 3701.143 make the General Assembly's subsequent and current intent less clear. Therefore, this court must look at other factors to determine legislative intent.

### Review of Administrative Construction of the Statute for Legislative Intent

█ {¶ 30} In addition to considering legislative history and former statutory provisions in order to determine legislative intent, R.C. 1.49 states that a court may also consider administrative construction of a statute. "When interpreting statutes, courts must give due deference to an administrative interpretation formulated by an agency that has accumulated substantial expertise and to which the General Assembly has delegated the responsibility of implementing the legislative command."[33] Therefore, this court will now examine the administrative construction of R.C. 4511.19(A) and 3701.143 by examining the promulgation of Ohio Adm.Code 3701–53–01 and 3701–53–03 regarding approved techniques

---

30. Am.Sub.S.B. No. 22, 148 Ohio Laws 22 (effective May 17, 2000).

31. Am.Sub.H.B. No. 87, 150 Ohio Laws 87 (effective June 30, 2003).

32. Am.Sub.S.B. No. 123, 150 Ohio Laws 123 (effective Jan. 1, 2004).

33. *State v. Cooper* (1997), 120 Ohio App.3d 284, 290, 697 N.E.2d 1049, citing *Swallow v. Indus. Comm.* (1988), 36 Ohio St.3d 55, 57, 521 N.E.2d 778.

and methods for determining concentration of alcohol in a person's blood, breath, or urine.

{¶ 31} In 1968, as directed by and pursuant to the authority granted to it by the General Assembly in R.C. 4911.19 and 3701.143, the Ohio Director of Health promulgated rules regarding the techniques or methods for chemically analyzing a person's blood, urine, or breath. Ohio Adm.Code 3701–53–01, effective March 1, 1968, reads:

> (A) Tests to determine the concentration of alcohol in a person's *blood* may be applied to blood, urine, breath, or other bodily substance. *Results shall be expressed as equivalent to grams of alcohol per one hundred (100) milliliters of blood.*[34]

This once effective version of Ohio Adm.Code 3701–53–01 is consistent with the clear intent of the General Assembly with the passage of Amended Substitute House Bill 380 in 1968—to correlate urine-sample analysis to the amount of alcohol in the blood. In addition, the text of Ohio Adm.Code 3701–53–03 at that time was consistent with the clear intent of Amended Substitute House Bill 380. Division (A) of Ohio Adm.Code 3701–53–03 outlined the approved blood, urine, breath, and other bodily substance test techniques or methods for determining the concentration of alcohol. Division (B) reads:

> (B) For purposes of this rule, three-fourths (3/4) of the determined concentration of alcohol in the urine shall be equivalent to the *corresponding blood alcohol concentration.*[35]

{¶ 32} In 1983, the ODH amended Ohio Adm.Code 3701–53–01 to read:

> (A) Tests to determine the concentration of alcohol in a person's *blood* may be applied to blood, urine, breath, or other bodily substance. Results shall be expressed as equivalent to: ~~grams of alcohol per one hundred (100) milliliters of blood~~.

> (1) per cent by weight in blood (grams per 100 milliliters of blood);

> (2) grams by weight of alcohol per two hundred ten liters of breath (blood alcohol concentration based on the deep lung air to blood ratio of 2,100:1);

---

34. (Emphasis added.) Ohio Adm.Code 3701–53–01. Copy of certified copy of true and accurate copy of existing rule Ohio Adm.Code 3701–53–01 adopted by Director of Health, John H. Ackerman, M.D., filed with Secretary of State on Jan. 20, 1976, *available at* Department of Health by public records request.

35. (Emphasis added.) Ohio Adm.Code 3701–53–03. Copy of certified copy of true and accurate copy of existing rule Ohio Adm.Code 3701–53–03 adopted by the Director of Health, John H. Ackerman, M.D., filed with the Secretary of State on Feb. 19, 1968, *available at* Department of Health by public records request.

(3) grams per weight of alcohol per one hundred milliliters of urine (grams per cent by weight).[36]

The Rule Summary and Fiscal Analysis filed by the DOH with the Legislative Service Commission states that the reason for filing this amendment to Ohio Adm.Code 3701–53–01 is to "comply with Amended Substitute S.B. 432."[37] It is significant to note that the amended and adopted version retains the language "tests to determine the concentration of alcohol in a person's *blood*." This is evidence of the director of health's construction of the intent of the General Assembly that in passing Amended Substitute Senate Bill 432, it intended to maintain the original intent of the General Assembly: to correlate urine-sample analysis to the amount of alcohol in the blood. Even more significant is the General Assembly's acquiescence to this construction via the Joint Committee on Agency Rule Review ("JCARR"). JCARR is tasked with reviewing proposed administrative rules to ensure that a rule is consistent with legislative intent. If JCARR finds that a proposed rule is inconsistent with legislative intent, it may recommend the adoption of a concurrent resolution to the General Assembly that would invalidate the rule. The court presumes that JCARR made no such recommendation with regard to this amendment, because the amended rule was ultimately adopted with the language "tests to determine the concentration of alcohol in a person's blood." The ultimate adoption affirms the director of health's interpretation of the General Assembly's intent to maintain the correlation.

{¶ 33} Ohio Adm.Code 3701–53–03 was also amended in 1983 as a result of the passage of Amended Substitute S.B. 432. The amendment deleted division (B), stated above, regarding the corresponding concentrations between concentration of alcohol in urine- and blood-alcohol concentration.[38] Subsequent amendments

---

**36.** (Emphasis added.) Ohio Adm.Code 3701–53–01(amended 1983). Copy of certified copy of a true and accurate copy of rule adopted by Director of Health as an emergency on March 15, 1983, signed by T.A. Gardner, M.D., Acting Director of Health, filed with the Secretary of State March 15, 1983, available at Department of Health by public records request. See also copy of certified copy of a true and accurate copy of rule adopted by Department of Health on June 3, 1983, effective June 13, 1983, signed by David L. Jackson, M.D., Ph.D., Director of Health, filed with the Secretary of State June 3, 1983, available at Department of Health by public records request.

**37.** Proposed amendments to Ohio Adm.Code 3701–53–01 by Director of Health, Rule Summary and Fiscal Analysis, filed with Legislative Service Commission March 17, 1983, available at Department of Health by public records request.

**38.** Proposed amendments to Ohio Adm.Code 3701–53–03 by Director of Health, Rule Summary, and Fiscal Analysis, filed with Legislative Service Commission March 17, 1983, available at Department of Health by public records request. See also proposed amendments by Director of Health to Ohio Adm.Code 3701–53–03, Rule Summary and Fiscal Analysis, filed with Legislative Service Commission May 3, 1983, available at Department of Health by

to Ohio Adm.Code 3701–53–03 relate to additions or deletions of approved techniques or methods and do not serve to clarify the intent of the General Assembly.

{¶ 34} In 1986, the director of health proposed amendments to Ohio Adm.Code 3701–53–01 "not as a result of recent legislation" but rather "to clarify and simplify." The director summarized the proposed amendments as "simplification to statement of results of test; clarification of method or technique on file at test site." [39] Here the director of health deemed it appropriate to clarify and simplify by making the following amendment: "Tests to determine the concentration of alcohol ~~in a person's blood~~ may be applied to blood, urine, breath or other bodily substance." [40] This amendment, rather than clarifying and simplifying, has only served to confuse matters.

{¶ 35} The text of subsequent amendments to Ohio Adm.Code 3701–53–01 does not serve to further clarify either the director of health's interpretation of the intent of the General Assembly nor the actual intent of the General Assembly; however, the Rule Summary and Fiscal Analysis prepared by the director of health regarding subsequent amendments do. In 1997, the director proposed amendments to Ohio Adm.Code 3701–53–01 "not as a result of recent legislation" but rather "to update techniques and methods to be used in tests for *blood* alcohol levels in bodily substances." The proposed amendments were summarized as "prescrib[ing] the techniques and methods to be used in testing for *blood* alcohol levels in bodily substances and to determine results." [41] In 2002, however,

---

public records request. See also copy of certified copy of a true and accurate copy of Ohio Adm.Code 3701–53–03 adopted by the Director of Health on June 3, 1983, signed by David L. Jackson, M.D., Ph.D., Director of Health, filed with the Secretary of State June 3, 1983, available at Department of Health by public records request.

39. Proposed amendments to Ohio Adm.Code 3701–53–01 by Director of Health, Rule Summary and Fiscal Analysis, filed with Legislative Service Commission July 24, 1986, available at Department of Health by public records request. See also proposed amendments by Director of Health to Ohio Adm.Code 3701–53–01, Rule Summary and Fiscal Analysis, filed with Legislative Service Commission Oct. 3, 1986, available at Department of Health by public records request.

40. Proposed amendments to Ohio Adm.Code 3701–53–01, supra note 37. See also copy of certified copy of Amended Ohio Adm.Code 3701–53–01 effective Jan. 1, 1987, signed by Thomas J. Halpin, M.D., M.P.H., Director of Health, filed with the Secretary of State Nov. 18, 1986, available at Department of Health by public records request.

41. (Emphasis added.) Proposed amendments to Ohio Adm.Code 3701–53–01 by Director of Health, Rule Summary and Fiscal Analysis, filed with Legislative Service Commission April 16, 1997, available at Department of Health by public records request. See also proposed amendments to Ohio Adm.Code 3701–53–01 by Director of Health, Rule Summary and Fiscal Analysis, filed with Legislative Service Commission May 23, 1997, available at Department of Health by public records request.

the director summarized five-year rule review amendments as "changes clarify techniques and methods used for chemical testing of blood, breath and urine." [42]

## Intent of the General Assembly to Correlate Urine Alcohol Tests to Blood-Alcohol Tests

{¶ 36} The Tenth District Court of Appeals has ruled that the General Assembly has the constitutional authority to define offenses and presumably could prohibit the operation of motor vehicles when a motorist has consumed any alcohol.[43] This court agrees that the General Assembly could prohibit the operation of motor vehicles when a motorist has consumed any alcohol. However, after having carefully considered the legislative history of R.C. 4511.19(A), formerly effective versions of R.C. 4511.19(A), and administrative construction of the statute for legislative intent, this court finds that the General Assembly did intend to correlate or relate urine-alcohol content to blood-alcohol content in enacting R.C. 4511.19(A)(1)(e) rather than to create a separate and distinct per se urine offense unrelated to the per se blood offense in R.C. 4511.19(A)(1)(b).

{¶ 37} Therefore, the court must now consider whether the director of health abused his discretion in promulgating Ohio Adm.Code 3701–53–01 and 3701–53–03.

## Determination that the Director of Health Did Not Abuse His Discretion

■ {¶ 38} Defense counsel argues that the director of health abused his discretion by not requiring that the second void of urine be measured in a urine chemical test rather than the first void. He supports his argument with Judge Boyer's decision in *State v. Oliver.*[44] The state argues that there was no abuse of discretion.

{¶ 39} R.C. 3701.143 requires the director of health to determine or cause to be determined the techniques or methods for chemically analyzing a person's urine in order to ascertain the amount of alcohol in the person's urine. The director has made this determination with the promulgation of Ohio Adm.Code 3701–53–01 and 3701–53–03.

{¶ 40} Ohio Adm.Code 3701–53–01 states:

---

42. Proposed amendments to Ohio Adm.Code 3701–53–01 by Director of Health, Rule Summary and Fiscal Analysis (Part A), July 1, 2002, available at Department of Health by public records request.

43. *Cox,* 1985 WL 10246, citing *Woerner,* 16 Ohio App.3d 59, 16 OBR 63, 474 N.E.2d 354.

44. *State v. Oliver* (Sept. 25, 2000), Washington C.P. No. 00 CR 15, Ruling on Motion to Suppress.

(A) Tests to determine the concentration of alcohol may be applied to blood, breath, urine, or other bodily substances. Results shall be expressed as equivalent to:

* * *

(3) Grams by weight of alcohol per one hundred milliliters of urine (grams per cent by weight).

{¶ 41} Ohio Adm.Code 3701–53–03(A) states:

(A) Alcohol in blood, urine and other bodily substances shall be analyzed based on approved techniques or methods. The technique or method must have documented sensitivity, specificity, accuracy, precision and linearity. The technique or method can be based on procedures which have been published in a peer reviewed or juried scientific journal or thoroughly documented by the laboratory. Approved techniques or methods include:

(1) Gas chromatography; and

(2) Enzyme assays.

■■ {¶ 42} "The United States Supreme Court instructs us that courts do owe deference to an agency's rulemaking authority. In *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.* * * * the court held: * * * '[L]egislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute. Sometimes the legislative delegation to an agency on a particular question is implicit rather than explicit. In such a case, a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency.'"[45] "It is axiomatic that administrative rules are valid unless they are unreasonable, or in clear conflict with the statutory intent of the legislation governing the subject matter. When the potential for conflict arises, the proper subject for determination is whether the rule contravenes an express provision of the statute."[46] "A rule which is unreasonable, arbitrary, discriminatory, or in conflict with law is invalid and unconstitutional because it surpasses administrative powers and constitutes a legislative function. * * * A rule that bears no reasonable relation to the legislative purposes of the authorizing statute improperly declares policy."[47]

**45.** *Charvat v. Dispatch Consumer Servs., Inc.* (2002), 95 Ohio St.3d 505, 508, 769 N.E.2d 829.

**46.** *Woodbridge Partners Group, Inc. v. Ohio Lottery Comm.* (1994), 99 Ohio App.3d 269, 650 N.E.2d 498; *Neinast v. Bd. of Trustees of the Columbus Metro. Library* (2006), 10th Dist., 165 Ohio App.3d 211, 845 N.E.2d 570.

**47.** *Midwestern College of Massotherapy v. Ohio Med. Bd.* (1995), 102 Ohio App.3d 17, 656 N.E.2d 963, citing *Weber v. Bd. of Health* (1947), 148 Ohio St. 389, 35 O.O. 351, 74 N.E.2d

{¶ 43} Finally, the Ohio Supreme Court has said that in promulgating regulations pursuant to R.C. 3701.143, it must be presumed that the director of health acted upon adequate investigation and in full awareness of the perceived problems. It further directs lower courts to defer to the department's authority and not substitute the court's judgment for that of the director of health.[48] Rules issued by administrative agencies pursuant to statutory authority have the force and effect of law.[49]

{¶ 44} Even taking into consideration this court's conclusion that the General Assembly intended to correlate urine-alcohol content to blood-alcohol content, this court does not find that the director of health abused his discretion in not requiring a second void of urine pursuant to Ohio Adm.Code 3701–53–01 or 3701–53–03. It is clear from the rule summary and fiscal analysis filed by the director of health that the intent of the General Assembly to correlate was considered when promulgating and subsequently amending Ohio Adm.Code 3701–53–01 and 3701–53–03, and therefore the court does not find the rules to be in conflict with the law or manifestly contrary to the law. The court also notes that the director has ultimately deferred to techniques or methods based "on procedures which have been published in a peer reviewed or juried scientific journal or thoroughly documented by the laboratory." Finally, the defendant's argument that 22 states do not allow urine testing and that five states require a second void does not convince this court that the director abused his discretion; rather, it convinces this court that there exist varying opinions regarding the best method. Consequently, deference to procedures that have been published in a peer-reviewed or juried scientific journal does not seem unreasonable, arbitrary, capricious, or discriminatory. Therefore, this court determines that the director of health did not abuse his discretion.

### Defendant's Request to Permit a *Daubert* [50] Reliability Challenge to the Urine Test

{¶ 45} In his posthearing brief, the defendant requests that this court reconsider its decision to exclude the testimony of his expert witness, Dr. Staubus, to attack the reliability of the first-void urine test. The defendant argues that such testimony does not question whether first-void urine tests in general are reliable,

---

331, and *Carroll v. Dept. of Adm. Servs.* (1983), 10 Ohio App.3d 108, 10 OBR 132, 460 N.E.2d 704.

48. *State v. Yoder* (1993), 66 Ohio St.3d 515, 613 N.E.2d 626.

49. *Doyle v. Ohio Bur. of Motor Vehicles* (1990), 51 Ohio St.3d 46, 554 N.E.2d 97.

50. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469. See, also, *Miller v. Bike* (1998), 80 Ohio St.3d 607, 687 N.E.2d 735.

but, rather, such testimony questions whether using the defendant's first void, rather than the defendant's second void, is a reliable indicator of the alcohol content affecting the defendant's bloodstream at the time of offense. The defendant argues that he will be prejudiced and his due-process rights will be violated if this court does not permit him to challenge the reliability of his test results. The state argues that this court should not reconsider its decision to exclude Dr. Staubus's testimony to attack the general reliability of the urine void. The state further argues that at the hearing it did not present evidence on the *Daubert* reliability issue regarding the defendant's specific test based on the court's ruling that it would not hear such an argument.

## Attack on General Reliability—Generally

{¶ 46} The Ohio Supreme Court in *State v. Vega* [51] held that "an accused may not make a general attack upon the reliability and validity of the breath testing instrument." Vega addressed the reliability of the general procedure for breath testing. The case before this court addresses the reliability of the general procedure for urine testing. However, the Tenth District, relying on *Vega*, has held that "expert testimony designed to impeach the general reliability of Ohio's legislatively determined urine-alcohol testing procedures is clearly inadmissible." [52] Therefore, consistent with the rulings in *Vega* and *Estep*, this court will not allow the defendant to use expert testimony to attack the general reliability or general accuracy of a legislatively determined test procedure—urine testing— as a valid scientific means of determining blood-alcohol levels.

## Attack on General Reliability—Daubert and Due Process

{¶ 47} *Vega* states, "There is no question that the accused may also attack the reliability of the specific testing procedure and the qualifications of the operator." [53] The defendant argues that he should be permitted to attack the defendant's specific first-void urine test for reliability and that if this court does not permit him to do so, his due-process rights will be violated. The defendant argues that his expert's testimony will not address the general reliability of the first-void urine test, but rather the reliability of the defendant's specific first-void urine test.

---

51. *State v. Vega* (1984), 12 Ohio St.3d 185, 190, 12 OBR 251, 465 N.E.2d 1303.

52. *State v. Estep* ( 1991), 73 Ohio App.3d 609, 598 N.E.2d 96.

53. *State v. Vega*, 12 Ohio St.3d 185, 12 OBR 251, 465 N.E.2d 1303. See, also, *Whitehall v. Weese* (Oct. 17, 1995), 10th Dist. (1995), 1995 WL 614139, quoting *Columbus v. Day* (1985), 24 Ohio App.3d 173, 174, 24 OBR 263, 493 N.E.2d 1002.

{¶ 48} Recently, the Tenth District Court of Appeals upheld the trial court's decision to exclude testimony that defense counsel proffered and argued would challenge the reliability of the defendant's specific testing procedure. The court noted, "[T]he difficulty in this case is that defense counsel attempted to challenge defendant's specific test result through argument and proffered testimony, which, in essence, challenged the general reliability of the testing procedure." In doing so, the court rejected the defendant's argument that suppression of such expert testimony would violate his right to due process, right to confront one's accusers, right to a jury determination of guilt, right to present a complete defense, and the prohibition against conclusive presumptions in criminal cases.[54]

{¶ 49} Similarly, a *Daubert* reliability challenge to the defendant's specific first-void urine test in this case would be, in essence, a challenge to the general reliability of the first-void urine-testing procedure. This court finds that such a challenge is precluded by *Vega*, and further finds that the defendant's due-process rights are not violated by suppression of Dr. Staubus's testimony. This court concurs with the Tenth District in noting that "this court is charged with accepting and enforcing the law promulgated by the Supreme Court, not changing, modifying or ignoring that law."[55] Therefore, this court will not allow the defendant to present expert testimony to address the reliability of the defendant's specific first-void urine test pursuant to *Daubert* because, in essence, that testimony would be a challenge to the general reliability of the first-void urine test.

### Attack on General Reliability—*Daubert* and Prejudice

{¶ 50} The defendant argues as well that prohibiting him from presenting expert testimony regarding the reliability of his specific first-void urine test would prejudice him. The defendant points to Judge Taylor's decision in *State v. Gaye*.[56] The reliability issue regarding first-void urine tests in *Gaye* was the same as the reliability issue presented in the instant case. Judge Taylor found *Gaye* to be analogous to the shifting burden of proof established in *State v. Workman*[57]

---

54. *State v. Sabo*, Franklin App. No. 04 AP–1114, 2006-Ohio-1521, 2006 WL 827643. See, also, *State v. Miskel* (Mar. 28, 2000), Franklin App. No. 99 AP–482, 2000 WL 311920, in which the Tenth District rejected defendant's argument that suppression of similar expert testimony would violate defendant's right to confrontation, right of compulsory process, right to present a complete defense, and right to due process.

55. *State v. Sabo*, 2006-Ohio-1521, 2006 WL 827643, ¶ 34.

56. *State v. Gaye* (Nov. 2, 2000), Franklin M.C. Nos. 2000 TRC 143892 and 2000 TRC 162041, Motion Hearing Entry.

57. *State v. Workman* (1996), 79 Ohio Misc.2d 26, 670 N.E.2d 315.

and *State v. Plummer*.[58] This court, however, disagrees.

{¶ 51} *State v. Plummer* held that "[a]bsent a showing of prejudice to a defendant, the results of a urine-alcohol test administered in substantial compliance with [the applicable Ohio Administrative Code regulations] are admissible in a prosecution under R.C. 4511.19." [59]

{¶ 52} Further, the *Plummer* court noted that appellant had not alleged or demonstrated that he had been prejudiced in any way by the state's failure to comply with the literal requirements of the administrative regulation regarding testing of urine specimens.

{¶ 53} In *Plummer*, evidence was presented showing that although substantially compliant with the Ohio Administrative Code, the administration of the urine test was not strictly or literally compliant with the Ohio Administrative Code.[60] In the instant case, the parties stipulated that applicable ODH regulations were substantially complied with by the police. The defendant, however, presented no evidence that (1) there was a lack of strict compliance with applicable ODH regulations and (2) if a lack of strict compliance existed, the defendant suffered prejudice as a result. In his initial motion to suppress, the defendant alleged lack of compliance within three specific ODH regulations: (1) failure to collect and analyze bodily substance in compliance with Ohio Adm.Code 3701–53–05, (2) failure to properly calibrate and operate the testing machine in compliance with Ohio Adm.Code 3701–53–04, and (3) failure to have properly licensed officer operate and calibrate the testing machine per Ohio Adm.Code 3701–53–07. The defendant, although not stipulating to strict compliance, did not present or proffer any evidence supporting his allegations of noncompliance with these regulations. If he had, it would have been his burden, pursuant to *Plummer*, to show that he suffered prejudice as a result of lack of strict compliance. Instead, in his hearing brief, the defendant requests that the court permit Dr. Staubus's testimony for the purpose of showing that using his first void, as opposed to second void of urine, is an unreliable indicator of the alcohol content affecting the defendant's blood stream at the time of the offense. This has nothing to do with lack of strict compliance with applicable ODH regulations. In fact, the defendant has stipulated that ODH regulations do not require a second-void urine sample to be taken and tested. As noted above, the court finds that Dr. Staubus's reliability testimony is, in essence, a challenge to the general reliability of the

58. *State v. Plummer* (1986), 22 Ohio St.3d 292, 22 OBR 461, 490 N.E.2d 902.

59. Id. at syllabus.

60. Id. In *Plummer*, the urine sample was not kept strictly refrigerated as required by Ohio Adm.Code 3701–53–05.

first-void urine-testing procedure. Such a challenge is precluded by *Vega*, and the court will not allow it under the guise of a *Plummer* burden-to-show-prejudice theory.

## Conclusion

{¶·54} Therefore, the court denies the defendant's motion to suppress, and the parties are to appear on May 15, 2006 at 9:30 a.m.

So ordered.